UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | Criminal No.  23cr10138 |
| v. | Violations: |
| (1) DANIEL JAMES CLEGGETT, JR. and (2) NICHOLAS ESPINOSA, | Counts One and Three: Wire Fraud Conspiracy (18 U.S.C. § 1349) |
| Defendants | Count Two: Conspiracy (18 U.S.C. § 371) |

Counts One and Three: Wire Fraud Conspiracy
(18 U.S.C. § 1349)

Count Two: Conspiracy
(18 U.S.C. § 371)

Counts Four – Twenty-Eight: Wire Fraud;
Aiding and Abetting
(18 U.S.C. §§ 1343 and 2)

Counts Twenty-Nine – Thirty-Four: Unlawful
Monetary Transactions; Aiding and Abetting
(18 U.S.C. §§ 1957 and 2)

Counts Thirty-Five – Thirty-Seven: Making
False Statements to a Mortgage Lending
Business; Aiding and Abetting
(18 U.S.C. §§ 1014 and 2)

Wire Fraud Forfeiture Allegation:
(18 U.S.C. § 981(a)(1)(C) and
28 U.S.C. § 2461)

Mortgage Fraud Forfeiture Allegation:
(18 U.S.C. § 982(a)(2)(A))

Money Laundering Forfeiture Allegation:
(18 U.S.C. § 982(a)(1))

INDICTMENT

At all times relevant to this Indictment:

General Allegations

1.     Defendant Daniel James CLEGGETT, Jr. was a resident of Kingston, Massachusetts.

CLEGGETT owned and operated (i) a sober home business and (ii) several insulation installation

businesses through the entities listed below:

      a.  A Vision From God LLC ("AVFG") was the entity that CLEGGETT formed in
November 2016 to own and operate his sober home business in Massachusetts.
From 2016 to the present, CLEGGETT owned and operated the following AVFG
sober homes:   Lakeshore Retreat (15 Lakeshore Drive, Wakefield MA)
("LAKESHORE RETREAT"); Brady's Place, aka, Brady's Place Retreat (192
Gardiner Road, Quincy MA) ("BRADY's RETREAT"); Lambert House (121
Lambert Avenue, Weymouth, MA) ("LAMBERT HOUSE"); Brady's Westville (4
Westville Terrace, Boston, MA) ("BRADY's WESTVILLE"); Brady's Place
Putnam (68 Putnam Street, Weymouth, MA) ("BRADY's PLACE PUTNAM");
Brady's Place (630 Main Street, Weymouth, MA, 61 Spear Street, Quincy, MA,
and 215 Summer Street, Weymouth, MA); and Seaver House (250 Seaver Street,
Boston, MA).

      b.  Green Save Energy Corp. ("GREEN SAVE"), the stated business of which was
"installation of insulation," was an entity that CLEGGETT formed in February
2018, but under his mother's name and with its address at 15 Lakeshore Drive,
Wakefield MA.   By 2020, CLEGGETT had changed GREEN SAVE's address to
his personal residence, and had appointed himself Treasurer.   CLEGGETT's
mother had no insulation installation work experience.

      c.  Environmental Construction Objective Inc. ("ECO"), the stated business of which
was "environmental construction services," was an entity that CLEGGETT formed
in June 2020, but in his then-girlfriend's (current spouse's) name and with its
address at defendant Nicholas ESPINOSA's residence.   CLEGGETT's girlfriend
("GIRLFRIEND") [1] had no work experience in environmental construction
services.

      d.  Green Giants, LLC ("GREEN GIANTS"), the stated business of which was
"construction and home improvement," was an entity that CLEGGETT formed in
June 2021, but in ESPINOSA's name (and later in ESPINOSA's girlfriend's name)
and with its address at ESPINOSA's residence, all in order to conceal
CLEGGETT's ownership of GREEN GIANTS.   ESPINOSA's girlfriend had no
work experience in construction and home improvement.

      e.  Insulation Situation, LLC ("INSULATION SITUATION"), the stated business of
which was "construction and home improvement work" was an entity that

---

[1] CLEGGETT and his GIRLFRIEND were married in September 2022.

CLEGGETT formed in June 2021, but under another individual's name in order to conceal CLEGGETT's ownership of INSULATION SITUATION.

2.      Defendant Nicholas ESPINOSA was a resident of Randolph, Massachusetts.   ESPINOSA worked for CLEGGETT by managing the day-to-day affairs of CLEGGETT's sober home business (e.g., enrolling sober home residents and collecting sober home rent payments from residents at LAKESHORE RETREAT, BRADY's RETREAT, etc.).    CLEGGETT paid ESPINOSA a regular salary from AVFG, as well as a salary from GREEN SAVE.

3.      From 2018 to 2022, CLEGGETT and ESPINOSA conspired with each other, and with others known and unknown to the Grand Jury, (i) to defraud a sober home client; (ii) to defraud different mortgage lending institutions to benefit CLEGGETT's sober home business; and (iii) to defraud a MASS Save lead vendor (described herein) into paying CLEGGETT's insulation businesses, all with the object of enriching themselves and their associates.

4.      From 2020 to 2022, CLEGGETT defrauded the United States Small Business Administration ("SBA") into giving hundreds of thousands of dollars in federal economic injury disaster loans to AVFG, GREEN SAVE, as well as a fictitious entity that CLEGGETT called the "Daniel Cleggett Sole Proprietorship," by submitting false loan applications.

### The Sober Home Wire Fraud Conspiracy and Scheme to Defraud

#### Sober Home Wire Fraud General Allegations

5.      Sober homes, or sober houses, are privately owned businesses that provide recovering addicts with room, board, and sober living support and guidance in a group home environment, usually located within private residences.   In Massachusetts, where there are several hundred sober homes, there is no state-mandated certification process for sober homes and no state-

3

mandated oversight of sober home operators.[2]   Essentially, any person who owns or leases residential property may operate a sober home business.

6.      BRADY's RETREAT, a five-bedroom, three-bathroom home in Quincy, MA was a rental property that CLEGGETT leased (at approximately $4,900 per month) and operated as a sober home.   At BRADY's RETREAT, CLEGGETT housed approximately 10 to 12 sober home residents each month, charging each resident approximately $3,000 per month.   ESPINOSA assisted CLEGGETT with invoicing and collecting rents from BRADY's RETREAT residents.

7.      Co-conspirator 1 ("CC#1") was a purported resident of BRADY's RETREAT from approximately January 2019 to January 2020.   CC#1's monthly rent at BRADY's RETREAT was paid by a family trust (the "FAMILY TRUST") that was based in New York, and which was operated by CC#1's family member ("FM-1").   Information as to the actual, true cost of monthly rent at BRADY's RETREAT was material to the FAMILY TRUST and FM-1.   The FAMILY TRUST issued checks from a New York-based bank that was a financial institution that conducted check transactions in and affecting interstate commerce.

### Overview of the Sober Home Wire Fraud Conspiracy and Scheme to Defraud

8.      From at least as early as January 2019 to in or about July 2020, CLEGGETT, ESPINOSA, CC#1, and co-conspirators known and unknown to the Grand Jury, agreed to defraud and overcharge the FAMILY TRUST by up to $12,500 each month by submitting false and fraudulent invoices to the FAMILY TRUST and sharing the proceeds among themselves.

---

[2] The Massachusetts Alliance for Sober Housing ("MASH") is a private organization that certifies sober homes that meet certain MASH standards and that pay a yearly fee to MASH.   MASH certification is not a prerequisite to owning or operating a sober home in Massachusetts.

9.      After overcharging the FAMILY TRUST by up to $12,500 each month, CLEGGETT would cause AVFG to issue "refund" checks that were payable to CC#1 from an AVFG account at TD Bank.

10.     Upon receiving the AVFG "refund checks," CC#1 would deposit such checks at financial institutions that conducted check cashing transactions in and affecting interstate and foreign commerce.

11.     In total, from in or about January 2019 to in or about July 2020, CLEGGETT and ESPINOSA collected $170,500 in rent payments (for approximately 10 months) from the FAMILY TRUST, of which CLEGGETT retained $51,750 and distributed $118,750 to CC#1.

### Object and Purpose of Sober Home Wire Fraud Conspiracy

12.     The object of the Sober Home Wire Fraud Conspiracy was to commit wire fraud.  The principal purpose of the conspiracy and scheme to defraud was to personally enrich CLEGGETT, ESPINOSA, and CC#1, while concealing the overbilling scheme from the FAMILY TRUST and FM-1.

### Manner and Means of the Sober Home Wire Fraud Conspiracy and Scheme to Defraud

13.     Among the manner and means by which CLEGGETT, ESPINOSA, and CC#1 carried out the conspiracy and the scheme to defraud were the following:

    a. Creating false and fraudulent BRADY's RETREAT invoices that charged CC#1 a $15,500 monthly fee for housing and treatment, instead of the approximately $3,000 monthly fee that was charged to other BRADY's RETREAT residents;

    b. Sending fraudulent BRADY's RETREAT invoices by email to FM-1 (via FM-1's assistant);

    c. Secretly issuing "refund" checks ranging from $6,500 to $12,500 payable to CC#1, and not the FAMILY TRUST, after receiving FAMILY TRUST checks for $15,500 payable to AVFG; and

d.   Secretly depositing the so-called refund checks in order to conceal from FM-1 and the FAMILY TRUST the existence of the "refund" checks that CLEGGETT had issued to CC#1.

<u>Acts in Furtherance of the Sober Home Wire Fraud Conspiracy and Scheme to Defraud</u>

14.   On or about January 16, 2019, ESPINOSA sent a fraudulent invoice to CC#1 that overcharged CC#1's rent at BRADY's RETREAT in the amount of $15,500:



----- Forwarded Message -----
**From:** "Lakeshore ████ @gmail.com" <████@bradysplace.org>
**To:** ' ████ >
**Sent:** Wed, Jan 16, 2019 at 4:14 PM
**Subject:** Brady's Place

January 16, 2019

To whom it may concern:

████ has a bed reserved for ████ here at Brady's Place as of 1/22/19, and will pay a total of 15,500 per month for treatment and housing. Brady's Place is located at 192 Gardiner Rd Quincy Ma 02169.

Please make checks available to:

A Vision From God LLC

If I can be of any assistance, please feel free to contact me at the number below. Also, you may want to check out www.bradysplace.org for more information.

15.   On or about January 25, 2019, CLEGGETT received and deposited a $15,500 check that was payable to AVFG from the FAMILY TRUST.

16.     On or about February 5, 2019, CLEGGETT caused an AVFG check to be issued to CC#1 in the amount of $11,750, with the entry memo, "Refund."

17.     On or about February 5, 2019, CLEGGETT emailed his bookkeeper/tax preparer to inform the bookkeeper/tax preparer to account for the $11,750 "refund" payment to CC#1 so that CLEGGETT and AVFG would not be taxed on the entire $15,500 that AVFG received from the FAMILY TRUST:



18.     On or about February 5, 2019, CC#1 deposited the $11,750 AVFG check at a TD Bank, N.A.[3] branch in Quincy, MA.

19.     In this manner, CLEGGETT, ESPINOSA, and CC#1 continued the scheme to defraud by sending false invoices to the FAMILY TRUST and FM-1, depositing $15,500 checks from the FAMILY TRUST payable to AVFG into AVFG's TD Bank account, and issuing "refund" checks to CC#1, which CC#1 subsequently deposited, via the transactions listed below:

| CHECK DATE | FROM | TO | MEMO | AVFG PMT | CC#1 PMT |
|---|---|---|---|---|---|
| 01/21/2019 | FAMILY TRUST | AVFG | | $15,500.00 | |
| 02/05/2019 | AVFG | CC#1 | refund | | $11,750.00 |
| 02/13/2019 | FAMILY TRUST | AVFG | | $15,500.00 | |

---

[3] TD Bank, N.A. was a United States subsidiary of a multinational bank based in Toronto, Canada, and which had bank branches primarily along the East Coast of the United States, including Massachusetts.   References herein to "TD Bank" include TD Bank, N.A.   TD Bank was a financial institution that conducted check transactions in and affecting interstate and foreign commerce.

| CHECK DATE | FROM | TO | MEMO | AVFG PMT | CC#1 PMT |
|---|---|---|---|---|---|
| 02/26/2019 | AVFG | CC#1 | refund | | $12,500.00 |
| 03/11/2019 | FAMILY TRUST | AVFG | | $15,500.00 | |
| 03/20/2019 | AVFG | CC#1 | refund | | $12,500.00 |
| 04/15/2019 | FAMILY TRUST | AVFG | | $15,500.00 | |
| 04/26/2019 | AVFG | CC#1 | refund | | $12,500.00 |
| 05/13/2019 | FAMILY TRUST | AVFG | | $15,500.00 | |
| 07/16/2019 | AVFG | CC#1 | refund | | $9,500.00 |
| 09/27/2019 | FAMILY TRUST | AVFG | Sept 30 to Oct 30 | $15,500.00 | |
| 10/04/2019 | AVFG | CC#1 | refund | | $6,500.00 |
| 11/04/2019 | FAMILY TRUST | AVFG | | $15,500.00 | |
| 11/22/2019 | AVFG | CC#1 | over payment | | $9,500.00 |
| 12/04/2019 | FAMILY TRUST | AVFG | | $15,500.00 | |
| 12/23/2019 | AVFG | CC#1 | refund | | $12,500.00 |
| 01/10/2020 | FAMILY TRUST | AVFG | Dec 30 to Jan 30 | $15,500.00 | |
| 02/11/2020 | AVFG | CC#1 | overpayment | | $12,500.00 |
| 02/03/2020 | FAMILY TRUST | AVFG | | $15,500.00 | |
| 03/30/2020 | AVFG | CC#1 | 2 months | | $9,500.00 |
| 05/28/2020 | FAMILY TRUST | AVFG | | $15,500.00 | |
| 07/10/2020 | AVFG | CC#1 | | | $9,500.00 |
| | | | Total Payments | $170,500.00 | $118,750.00 |
| | | | Total Funds Retained by AVFG | | $51,750.00 |

## The Sober Home Mortgage Fraud Conspiracy and Scheme to Defraud

### General Allegations

20.     After forming AVFG, CLEGGETT continuously sought to acquire additional residential property in Massachusetts in order to expand his sober home business.

21.     From approximately October 2019 to December 2021, CLEGGETT personally, and through other co-conspirator straw purchasers, purchased the following three residential properties to use as sober homes (dates and amounts approximate):

8

| Property Address | Purchase Date | Purchase Price | Mortgage Amount (Lender) |
|---|---|---|---|
| 121 Lambert Avenue Weymouth, MA ("Lambert-P1") | Oct. 10, 2019 | $575,000 | $546,250 (Guaranteed Rate) |
| 4 Westville Terrace Boston, MA ("Westville-P2") | July 26, 2021 | $550,000 | $531,389 (Monarch Mortgage) |
| 68 Putnam Street Weymouth, MA ("Putnam-P3") | Dec. 20, 2021 | $480,000 | $463,980 (Guaranteed Rate) |

22.     Soon after their respective purchase dates, CLEGGETT opened and operated each of the above properties as sober homes, as follows: (i) Lambert-P1 as LAMBERT HOUSE (approximately since March 2020); (ii) Westville-P2 as BRADY's WESTVILLE (approximately since September 2021); (iii) Putnam-P3 as BRADY's PLACE PUTNAM (approximately since April 2022).

23.     Guaranteed Rate, a Chicago-based mortgage lending company ("Rate.Com"), and Monarch Mortgage,[4] a Virginia-based mortgage lending company ("Monarch," together with Rate.Com, the "Mortgage Lenders"), each did business in interstate commerce, including home mortgage lending in Massachusetts.

24.     As part of the Mortgage Lenders' home mortgage lending process, mortgage applicants were required to (i) complete a mortgage application, in which applicants were to (ii) provide truthful and accurate information about each applicant, their income, assets, liabilities, and intended use of the property (e.g., as a "primary residence"), and (iii) acknowledge under penalty of federal prosecution that information that they provided in the application was true and accurate.

---

[4] Monarch was a division of Blue Ridge Bank, N.A., Sarasota, Florida.  References to Monarch and Monarch Mortgage herein shall include Blue Ridge Bank, N.A. for all purposes.

25.     In issuing home mortgage loans, the Mortgage Lenders generally issued loans on more favorable terms to borrowers that sought loans to purchase property that would serve as the borrower's "primary residence."   Thus, for example, a borrower seeking a mortgage to purchase a primary residence would be eligible for a lower down payment and, thus, could borrow an amount that was higher in proportion to the purchase price.[5]

26.     Truthful and accurate information from prospective borrowers in the mortgage application, as well as during the mortgage application process, was material to the Mortgage Lenders because they relied upon such information in evaluating the creditworthiness of the applicant and assessing the risk of loss in issuing the mortgage loan to the applicant.

### Overview of the Sober Home Mortgage Fraud Conspiracy

27.     Beginning in or about June 2019 and continuing through in or about July 2022, CLEGGETT, ESPINOSA, and co-conspirators known and unknown to the Grand Jury, agreed to submit false information and fraudulent documentation to the Mortgage Lenders in order to obtain home mortgage loans for properties that CLEGGETT acquired in order to expand his sober home business.

### Object and Purpose of the Sober Home Mortgage Fraud Conspiracy

28.     The object of the Mortgage Fraud Conspiracy was to make a false statement to a mortgage lending business.   The principal purpose of the conspiracy was to use fraudulent means to obtain home mortgage loans from the Mortgage Lenders in order to purchase Lambert-P1, Westville-P2, and Putnam-P3.

---

[5] The Mortgage Lenders referred to this ratio as the Loan-to-Value ("LTV") Ratio.   Thus, as noted above, borrowers seeking financing for primary residences were generally permitted higher LTV Ratios, and could borrow a greater portion of the purchase price, up to 95% in some cases.

<u>Manner and Means of the Sober Home Mortgage Fraud Conspiracy</u>

29.    Among the manner and means by which CLEGGETT, ESPINOSA, and their co-conspirators carried out the conspiracy and scheme to defraud were the following:

      a.   Falsely representing to the Mortgage Lenders on mortgage applications that Lambert-P1, Westville-P2, and Putnam-P3 were intended to be purchased as primary residences when, in reality, each was intended to be a sober home, i.e., a commercial property;

      b.   Fabricating a lease arrangement between CLEGGETT (as landlord) and his GIRLFRIEND (as tenant) to create the appearance that CLEGGETT was leaving (and renting out) his Kingston residence (the "CLEGGETT RESIDENCE") and was purchasing Lambert-P1 as his primary residence;

      c.   Using straw purchasers on mortgage applications for Westville-P2 (co-conspirator 2 ("CC#2")) and for Putnam-P3 (ESPINOSA), knowing that CLEGGETT was the intended owner of both properties;

      d.   Executing agreements that required each of CC#2 and ESPINOSA to transfer Westville-P2 and Putnam-P3, respectively, to CLEGGETT for the sum of $100 each; and

      e.   Funding the mortgage payments on the properties that were nominally owned by the straw purchasers in order to avoid default by the straw purchasers.

<u>Overt Acts in Furtherance of the Sober Home Mortgage Fraud Conspiracy</u>

30.    From in or about 2019 through in or about 2022, CLEGGETT, ESPINOSA, and coconspirators known and unknown to the Grand Jury committed and caused to be committed the following overt acts, among others, in furtherance of the conspiracy:

    *Lambert-P1 Mortgage*

      a.   On or about June 13, 2019, CLEGGETT caused a Rate.Com loan officer to email CLEGGETT and CLEGGETT's real estate agent, asking what monthly rent CLEGGETT could charge for the CLEGGETT RESIDENCE:   "What do you think a REALISTIC monthly rent we could use for [CLEGGETT's] current property in Kingston?  We are going to be using this rental income to help qualify for his new loan."

      b.   On or about September 9, 2019, CLEGGETT executed a one-year lease agreement, with CLEGGETT as the landlord and his GIRLFRIEND as the tenant, with his GIRLFRIEND paying $3,200 per month to live at the CLEGGETT RESIDENCE.

c.  On or about September 17, 2019, CLEGGETT and his GIRLFRIEND caused $3,200 in cash to be deposited into his GIRLFRIEND's checking account (which had a balance of approximately $1,050 prior to the deposit).

d.  On or about September 17, 2019, CLEGGETT's GIRLFRIEND issued a $3,200 check from her checking account payable to CLEGGETT, with the memo: "sec. dep [the CLEGGETT RESIDENCE address] – Kingston."

e.  On or about October 10, 2019, CLEGGETT submitted the loan application for Lambert-P1 to Rate.Com, in which CLEGGETT falsely represented, among other things: (i) that CLEGGETT intended to purchase Lambert-P1 as his primary residence; (ii) that CLEGGETT was renting out the CLEGGETT RESIDENCE (in Kingston); and (iii) that CLEGGETT was receiving rental income of $3,200 per month.

f.  On or about January 6, 2020, CLEGGETT deposited a $3,200 "rent" check from his GIRLFRIEND to maintain the ruse that CLEGGETT was renting out the CLEGGETT RESIDENCE.

g.  On or about February 11, 2020, CLEGGETT deposited a $3,200 "rent" check from his GIRLFRIEND to maintain the ruse that CLEGGETT was renting out the CLEGGETT RESIDENCE.

h.  On or about March 6, 2020, CLEGGETT deposited a $3,200 "rent" check from his GIRLFRIEND to maintain the ruse that CLEGGETT was renting out the CLEGGETT RESIDENCE.

*Westville-P2 Mortgage*

i.  On or about April 10, 2021, CLEGGETT caused an automated email to be sent to him from his real estate agent notifying CLEGGETT that a residential property for sale – Westville-P2 – had matched CLEGGETT's property search criteria, which was labeled, "Sober Home Purchase."

j.  On or about May 28, 2021, CLEGGETT caused GREEN SAVE to issue CC#2 a $5,000 bonus in order to boost CC#2's finances to help qualify CC#2 for the Westville-P2 mortgage loan.

k.  On or about July 6, 2021, CLEGGETT caused GREEN SAVE to issue CC#2 a letter that stated that CC#2's GREEN SAVE salary was being increased to $2,000 per week to further help qualify CC#2 for the Westville-P2 mortgage loan.

l.  On or about July 15, 2021, CLEGGETT executed a gift letter, agreeing to pay a $20,000 deposit and $26,500 at closing to CC#2, to assist in the purchase of Westville-P2.

m.  On or about July 26, 2021, CLEGGETT issued an official check for $25,000 payable towards the mortgage closing for Westville-P2.

n.  On or about July 26, 2021, CC#2 submitted the loan application for Westville-P2 to Monarch, in which CC#2 falsely represented, among other things, that: (i) CC#2 intended to purchase Westville-P2 as his primary residence; and (ii) that CC#2 was the borrower and owner of Westville-P2, when, in fact, CLEGGETT was the true borrower and intended owner of Westville-P2.

o.  On or about July 26, 2021, CLEGGETT and CC#2 executed an "Option to Purchase" agreement, which (i) prohibited CC#2 from transferring or selling Westville-P2 without CLEGGETT's permission; and (ii) required CC#2 to sell Westville-P2 to CLEGGETT for $100 at any time within six years[6] from July 26, 2021, as excerpted below:

> 1. For a period of six (6) years, Daniel Cleggett shall have the option to purchase 4 Westville Terrace, Boston, MA 02124 (the "Property") from ▮▮▮▮▮▮▮t for the sum of $100.
>
> 2. Upon the delivery by check or cash of $100 to ▮▮▮▮▮▮▮t by Daniel Cleggett, ▮▮▮▮▮▮▮t shall provide an executed, notarized deed, in a form appropriate for recording with the registry of deeds, to evidence and effectuate transfer of ownership of the Property to Daniel Cleggett.

p.  After CC#2 made two initial mortgage payments for Westville-P2, CC#2 stopped making payments, and CLEGGETT began making monthly Westville-P2 mortgage payments from an AVFG bank account that CLEGGETT controlled, on or about the dates below:

| Date | CLEGGETT Westville-P2 Mortgage Payment |
|---|---|
| 1/10/2022 | $3,334.42 |
| 2/9/2022 | $3,334.42 |
| 4/11/2022 | $3,334.42 |
| 5/11/2022 | $3,334.42 |
| 6/13/2022 | $3,334.42 |
| 7/18/2022 | $3,334.42 |
| **Total** | **$20,006.52** |

---

[6] If CLEGGETT had extended the buyout term to more than seven years (instead of limiting it to six years), CLEGGETT would have been required to publicly register the Option to Purchase Agreement with the Registry of Deeds to preserve his rights in the property. By limiting the term to six years, CLEGGETT could conceal the existence of the Option to Purchase Agreement.

*Putnam-P3 Mortgage*

q.  On or about March 21, 2021, CLEGGETT caused an automated email to be sent to him from his real estate agent notifying CLEGGETT that a residential property for sale – Putnam-P3 – had matched CLEGGETT's property search criteria, which was labeled, "Sober Home Purchase."

r.  On or about October 6, 2021, ESPINOSA caused a sham gift letter to be executed in the name of his girlfriend whereby she purported to pay $4,356.33 to ESPINOSA to assist in the purchase of Putnam-P3.

s.  On or about December 20, 2021, ESPINOSA submitted the loan application for Putnam-P3 to Rate.Com, in which ESPINOSA falsely represented, among other things, that: (i) ESPINOSA intended to purchase Putnam-P3 as his primary residence; (ii) that the payment from ESPINOSA's girlfriend was a gift; and (iii) that ESPINOSA was the borrower and intended owner of Putnam-P3, when, in fact, CLEGGETT was the true borrower and intended owner of Putnam-P3.

t.  On or about December 30, 2021, CLEGGETT and ESPINOSA executed an "Option to Purchase" agreement, which (i) prohibited ESPINOSA from transferring or selling Putnam-P3 without CLEGGETT's permission; and (ii) required ESPINOSA to sell Putnam-P3 to CLEGGETT for $100 at any time within six years from December 30, 2021, as excerpted below:

> 1.  For a period of six (6) years, Daniel Cleggett shall have the option to purchase 68 Putnam Street, Weymouth, MA 02189 (the "Property") from Nicholas Espinosa for the sum of $100.
>
> 2.  Upon the delivery by check or cash of $100 to Nicholas Espinosa by Daniel Cleggett, Nicholas Espinosa shall provide an executed, notarized deed, in a form appropriate for recording with the registry of deeds, to evidence and effectuate transfer of ownership of the Property to Daniel Cleggett.

## The Insulation Company Wire Fraud Conspiracy and Scheme to Defraud

### Insulation Company Wire Fraud General Allegations

31.  In 2018, CLEGGETT formed GREEN SAVE in order to obtain millions of dollars in lucrative insulation contracting work that was allocated to Massachusetts contracting firms pursuant to the Mass Save program.  In 2020, CLEGGETT formed ECO under his GIRLFRIEND's name to conceal his joint ownership of GREEN SAVE and ECO, and to obtain

additional Mass Save contracts that could be allocated pursuant to any woman-owned business initiatives under the program.   Prior to forming GREEN SAVE and ECO, CLEGGETT had little to no experience operating an insulation installation business, and his GIRLFRIEND had none.

32.     Although CLEGGETT had little to no experience in owning and operating an insulation business, the barriers to entering the business were relatively low, and CLEGGETT was able to take advantage of a steady supply of low-priced labor from recruiting his sober home residents to work as GREEN SAVE employees.

   *The Mass Save Program and Company A*

33.     The Commonwealth of Massachusetts requires consumers to pay an energy efficiency surcharge, which is included in, for example, every homeowner's monthly electric bill.   Electric and natural gas distribution companies (*e.g.,* National Grid, Eversource) are required to collect these surcharges – which amount to hundreds of millions of dollars each year – and use these energy efficiency funds ("EE Funds") to fund energy efficiency programs and initiatives in Massachusetts.

34.     Mass Save is a public/private partnership in Massachusetts in which sponsors of the Mass Save program (gas and electric utility companies, including National Grid and Eversource) use the EE Funds to fund energy conservation projects and improvements for consumers.   EE funds are then distributed under the Mass Save program through lead vendors.   Utility companies select lead vendors who (i) obtain contracts with consumers; and (ii) select and oversee contractors to perform the energy conservation and improvement work for consumers, among other things.   The utility companies then disbursed EE Funds to the lead vendor to pay the contractor for the work performed.   The utility companies compensated the lead vendor an administration fee for performing its role.

35.     Company A was a lead vendor under the Mass Save program.    As a lead vendor, Company A had the authority to: (i) select contractors for the Mass Save program; (ii) assign residential Mass Save insulation jobs to contractors; and (iii) pay insulation contractors with funds derived from the Mass Save program.    To distribute Mass Save contracts evenly among these small businesses, Company A barred, for example, individuals from owning (and using) multiple insulation companies to obtain contracts in Company A's Mass Save program.[7]

36.     A company applying to be a contractor in Company A's Mass Save program was required to provide truthful information about the company's ownership and the company's employees during the application process.    This information was material to Company A's decision-making process in accepting contractors and allowing them to participate in Company A's Mass Save program.

*Company A Terminates GREEN SAVE and ECO from Company A's Mass Save Program*

37.     GREEN SAVE and ECO both participated in Company A's Mass Save program.    From 2018 through mid-2021, Company A paid GREEN SAVE and ECO millions of dollars to do residential insulation work under the Mass Save program.

38.     In early 2021, Company A received a customer complaint concerning one of GREEN SAVE's Mass Save insulation jobs in Arlington, Massachusetts (the "Arlington Job").    Company A also learned that GREEN SAVE had not obtained the necessary town work permit to perform

---

[7] Many insulation contractors participating in Company A's Mass Save program were registered as either Independent Installment Contractors ("IIC") or Home Performance Contractors ("HPC").   GREEN SAVE was an IIC and ECO was an HPC.   Prior to 2021, individuals owning multiple IICs/HPCs were barred from simultaneously participating in Company A's Mass Save program.   Beginning in or about 2021, individuals owning two or more IICs (or an IIC and an HPC) needed Company A's permission and needed to meet certain requirements in order to simultaneously participate in Company A's Mass Save residential program.

the Arlington Job, but had received reimbursement from Company A as if GREEN SAVE had obtained the proper permit.[8]

39.     After an internal audit, Company A discovered that both GREEN SAVE and ECO had not obtained necessary town permits on several Mass Save jobs, but that GREEN SAVE and ECO had sought and received reimbursement from Company A for the costs of the permits anyway.

40.     On or about June 9, 2021, Company A issued letters to GREEN SAVE (addressed to CLEGGETT) and ECO (addressed to CLEGGETT's GIRLFRIEND) notifying them that they were being terminated from Company A's Mass Save program, effective June 18, 2021.   In the termination letters, Company A also issued the following admonition:

> **You will be precluded from reapplying to the Mass Save program, including performing work for another utility or under an alternative business entity, for a period of not less than one year from today's date, after which time your application for reinstatement can be considered.**

41.     Around the same time, other Mass Save lead vendors that did business with GREEN SAVE and ECO discovered the same improper permitting practice and terminated GREEN SAVE and ECO from their Mass Save programs, as well.

42.     In response to the imminent termination of GREEN SAVE from Company A's Mass Save program, in or about June 2021, CLEGGETT, ESPINOSA, CC#2, CC#3, and other co-conspirators known and unknown to the Grand Jury, met to form new insulation companies with straw owners in order to continue to receive Company A Mass Save contracts.

---

[8] In addition to using sober home clients as GREEN SAVE employees, CLEGGETT cut costs by paying individuals for the use of their Massachusetts construction contractor licenses to apply for town work permits.   These individuals – contrary to CLEGGETT's representations to Company A – were not employees of GREEN SAVE or ECO, but rather were solely paid by CLEGGETT for the use of their licenses, and they performed no job inspection work for GREEN SAVE or ECO.

Overview of the Insulation Company Wire Fraud Conspiracy and Scheme to Defraud

43.     From at least as early as June 2021 to in or about January 2023, CLEGGETT, ESPINOSA, and co-conspirators known and unknown to the Grand Jury, agreed to defraud Company A by obtaining Company A Mass Save contracts through newly formed insulation companies – GREEN GIANTS and INSULATION SITUATION – that CLEGGETT secretly owned and controlled through the use of straw owners, and by obtaining payments pursuant to these contracts.

Object and Purpose of the Insulation Company Wire Fraud Conspiracy

44.     The object and purpose of the Insulation Company Wire Fraud Conspiracy was to commit wire fraud.   The principal purpose of the conspiracy and scheme to defraud was to personally enrich CLEGGETT, ESPINOSA, and their co-conspirators.

Manner and Means of the Insulation Company Conspiracy and Scheme to Defraud

45.     Among the manner and means by which CLEGGETT, ESPINOSA, and their co-conspirators carried out the conspiracy and scheme to defraud were the following:

a.  Creating new insulation companies, GREEN GIANTS and INSULATION SITUATION;

b.  Causing GREEN GIANTS and INSULATION SITUATION to apply to participate as Independent Installation Contractors (IICs) in Company A's Mass Save program;

c.  Using straw owners for GREEN GIANTS (ESPINOSA's girlfriend) and INSULATION SITUATION (co-conspirator #3 ("CC#3")) in order to conceal CLEGGETT's ownership and control of such entities;

d.  Opening new bank accounts for GREEN GIANTS and INSULATION SITUATION in the names of the straw owners to further conceal CLEGGETT's ownership of the new companies; and

e.  Executing agreements between the straw owners and CLEGGETT whereby CLEGGETT maintained exclusive control and authority over GREEN GIANTS and INSULATION SITUATION.

Acts in Furtherance of the Insulation Company Wire Fraud Conspiracy and Scheme to Defraud

46.   On or about June 28, 2021, CLEGGETT and ESPINOSA caused a certificate of organization for GREEN GIANTS to be filed with the Massachusetts Secretary of the Commonwealth, Corporations Division, with ESPINOSA as the manager of GREEN GIANTS.

47.   On or about June 28, 2021, CLEGGETT and CC#3 caused a certificate of organization for INSULATION SITUATION to be filed with the Massachusetts Secretary of the Commonwealth, Corporations Division, with CC#3 as the manager of INSULATION SITUATION.

48.   On or about July 10, 2021, CLEGGETT and ESPINOSA caused a certificate of amendment for GREEN GIANTS to be to be filed with the Massachusetts Secretary of the Commonwealth, Corporations Division, with ESPINOSA's girlfriend as the manager of GREEN GIANTS.

49.   On or about July 13, 2021, CLEGGETT and CC#3 opened an INSULATION SITUATION bank account with TD Bank, listing CC#3 as the 100% owner of INSULATION SITUATION.

50.   On or about July 14, 2021, CLEGGETT caused a GREEN GIANTS bank account to be opened with TD Bank listing ESPINOSA's girlfriend as the 100% owner of GREEN GIANTS.

51.   On or about July 20, 2021, at approximately 8:37 a.m., CLEGGETT emailed CC#3 an Operating Agreement for INSULATION SITUATION, dated June 24, 2021, which agreement specified that: (i) CLEGGETT would own 99% of INSULATION SITUATION; (ii) CLEGGETT would control INSULATION SITUATION as its majority owner; and (iii) CLEGGETT would have the right to buy out CC#3's 1% ownership interest upon 10 days' notice.

52.   On or about July 20, 2021, at approximately 8:39 a.m., CLEGGETT emailed CC#3 a copy of CLEGGETT's signature to the INSULATION SITUATION Operating Agreement.

53.   On or about July 20, 2021, at approximately 9:03 a.m., CC#3 emailed CLEGGETT a copy of CC#3's signature to the INSULATION SITUATION Operating Agreement.

54.     On or about July 20, 2021, at approximately 9:12 a.m., CLEGGETT emailed ESPINOSA

and ESPINOSA's girlfriend a copy of CLEGGETT's signature to the GREEN GIANTS Operating

Agreement.

55.     On or about July 20, 2021, at approximately 9:13 a.m., CLEGGETT emailed ESPINOSA

and ESPINOSA's girlfriend an Operating Agreement for GREEN GIANTS, dated June 24, 2021,

which agreement specified that (i) CLEGGETT would own 99% of GREEN GIANTS; (ii)

CLEGGETT would control GREEN GIANTS as its majority owner; and (iii) CLEGGETT would

have the right to buy out ESPINOSA's girlfriend's interest upon 10 days' notice.

56.     On or about July 20, 2021, at approximately 9:27 a.m., ESPINOSA emailed CLEGGETT

a copy of ESPINOSA's girlfriend's signature to the GREEN GIANTS Operating Agreement.

57.     On or about August 9, 2021, CLEGGETT and ESPINOSA caused ESPINOSA's girlfriend

to enter into a Mass Save participation agreement with Company A, representing that

ESPINOSA's girlfriend was the sole owner of GREEN GIANTS.

58.     On or about September 9, 2021, CC#3 entered into a Mass Save participation agreement

with Company A, representing that CC#3 was the sole owner of INSULATION SITUATION.

59.     On or about the approximate dates below, CLEGGETT caused Company A to issue the

following approximate payments to GREEN GIANTS and INSULATION SITUATION, pursuant

to Company A's Mass Save program:

| Date | Company A Payment (payee) | |
|---|---|---|
| 12/8/2021 | $8,746.46 | GREEN GIANTS |
| 4/21/2022 | $10,558.79 | INSULATION SITUATION |
| 5/5/2022 | $11,640.29 | INSULATION SITUATION |
| 6/2/2022 | $27,851.08 | GREEN GIANTS |
| 7/21/2022 | $12,439.91 | INSULATION SITUATION |
| 8/4/2022 | $16,651.72 | GREEN GIANTS |
| 8/18/2022 | $28,196.17 | INSULATION SITUATION |
| 10/27/2022 | $25,327.97 | GREEN GIANTS |
| 12/9/2022 | $18,795.75 | GREEN GIANTS |
| 12/15/2022 | $19,263.87 | INSULATION SITUATION |

60.     From in or about November 2021 to in or about January 2023, CLEGGETT caused

Company A to make the following approximate total payments to GREEN GIANTS and

INSULATION SITUATION, pursuant to Company A's Mass Save program:

| Entity | Company A Payments |
|---|---|
| GREEN GIANTS | $509,326.57 |
| INSULATION SITUATION | $445,116.55 |
| **Total** | **$954,443.12** |

**The EIDL Scheme to Defraud**

EIDL Scheme to Defraud General Allegations

*Overview of the CARES Act*

61.     The Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") was a federal

law enacted on March 27, 2020, designed to provide emergency financial assistance to the millions

of Americans who were suffering the economic effects caused by the COVID-19 pandemic. One

source of funding for small businesses was Economic Injury Disaster Loans ("EIDL").

62.     The CARES Act and subsequent legislation, enacted between on or about December 27,

2020, and on or about March 11, 2021, allocated billions of dollars in COVID-related EIDL

funding. The CARES Act and subsequent legislation also authorized the SBA to provide EIDLs

of up to $2 million to eligible small businesses experiencing substantial financial disruptions due

to the COVID-19 pandemic.   In addition, the CARES Act and subsequent legislation authorized

the SBA to issue small businesses advances of up to $10,000 ($1,000 per employee) within three

days of applying for an EIDL.

63.     In order to obtain an EIDL and advance, a qualifying business was required to submit an

application to the SBA and provide information about its operations, such as the number of

employees, gross revenue for the 12-month period preceding the disaster, and cost of goods sold

in the 12-month period preceding the disaster.   In the case of EIDLs for COVID-19 relief, the 12-

month period was the period preceding January 31, 2020.   For a business to be eligible for an

EIDL, the business must have been in operation before February 1, 2020.   The applicant was also

required to certify, under penalty of perjury, that all of the information in the application was true

and correct to the best of the applicant's knowledge.

64.   The application required the applicant to verify whether the applicant was engaged in any

illegal activity.   If the applicant did not so verify, the EIDL loan application could not be

submitted and the application process was terminated.

65.   All EIDL applications were submitted online. All applications submitted on July 11, 2020

or after were handled by an SBA contractor with servers located in Des Moines, Iowa. Prior to

July 11, 2020, EIDL applications were submitted through three different servers, located in

Boydton, Virginia, West Des Moines, Iowa, or Quincy, Washington.

66.   Approval of an EIDL application and the amount of a loan was based, in part, on the

information provided on the application about the number of employees, gross revenue, and cost

of goods, as described above. The EIDL applications required minimal documentation and

information from small businesses to process the loan for approval.   Information as to the true

owner of the business, the history and revenue of the business, and the certification that the

applicant was not engaged in any illegal activity, among other things, was material to the decision-

making process of the SBA.

67.   Once an SBA EIDL application was approved, the SBA's Denver Finance Center, located

in Denver, Colorado, created payment files and authorized payments of the EIDL funds based on

those applications.   The disbursement of the EIDL funds were transmitted by the Financial

Management System ("FMS") to the United States Department of the Treasury and then to the

recipient's bank account.    The primary server for the FMS is in Sterling, Virginia. Upon approval

of an application for an EIDL or advance, the SBA would disburse the funds.

*CLEGGETT Submits Three COVID EIDL Applications Within One Hour on April 1, 2020*

68.    On or about April 1, 2020, at the approximate times below, CLEGGETT submitted three

COVID EIDL applications from the same IP Address[9] (ending 13e7:ac10), requesting (and

ultimately receiving) the following loans and advances:

| Time | CLEGGETT Entity | EIDL Loan | EIDL Advance |
|------|-----------------|-----------|--------------|
| 6:14 p.m. | AVFG | $150,000 | $2,000 |
| 6:30 p.m. | "Daniel Cleggett Sole Proprietorship" | $130,900 | $1,000 |
| 7:08 p.m. | GREEN SAVE | $150,000 | $10,000 |
| **Total** | **$443,900** | $430,900 | $13,000 |

69.    On each COVID EIDL application, CLEGGETT certified, under penalty of perjury, that

he was not engaged in any illegal activity:

**Disclosures**

**Eligible Entity Verification**
Applicant is a business with not more than 500 employees.

☐    Applicant is not engaged in any illegal activity (as defined by Federal guidelines).

70.    CLEGGETT knew that the AVFG EIDL application was false because, as of April 1, 2020,

CLEGGETT was engaged in illegal activity, which included:

    a.  On or about March 30, 2020, CLEGGETT issued the below "refund" check for
        $9,500 to CC#1 as part of the ongoing Sober Home Wire Fraud Conspiracy:

---

[9] An IP Address is a unique string of characters that identifies each computer using the Internet Protocol to
communicate over a network.



b. On or about March 6, 2020, CLEGGETT deposited the below $3,200 "rent" check from his GIRLFRIEND for the CLEGGETT RESIDENCE as part of the ongoing Sober Home Mortgage Fraud Conspiracy.



71.   CLEGGETT knew that the "Daniel Cleggett Sole Proprietorship" EIDL application was false because, among other things:

   a.   There was no such business as the "Daniel Cleggett Sole Proprietorship."

   b.   The "Daniel Cleggett Sole Proprietorship" had not been in business since October 1, 2018, and was not engaged in the business of "Real Estate," as CLEGGETT claimed in the application.

   c.   The "Daniel Cleggett Sole Proprietorship" did not have the 2019 gross revenues and costs of goods sold that CLEGGETT claimed in the EIDL application (below):

| | |
|---|---|
| Gross Revenues for the Twelve(12) Month Prior to the Date of the Disaster (January 31, 2020) | $350,201.00 |
| Cost of Goods Sold for the Twelve(12) Month Prior to the Date of the Disaster (January 31, 2020) | $86,410.00 |

24

d. Instead, CLEGGETT fabricated gross revenues and costs of goods sold for the "Daniel Cleggett Sole Proprietorship" by simply inputting information from his personal 2019 income tax return, which included his personal income from salaries that he received from AVFG and GREEN SAVE, and his total taxes owed for 2019:

| | | | |
|---|---|---|---|
| b | Add lines 1, 2b, 3b, 4b, 4d, 5b, 6, and 7a. This is your **total income** . . . . . . . . . . . . ▶ | 7b | 350,201. |
| 16 | Add lines 14 and 15. This is your **total tax** . . . . . . . . . . . . . . . . . . . . . ▶ | 16 | 86,410. |

e. The only sole proprietorship income that CLEGGETT claimed on his 2019 federal income tax return form 1040 came from "Counseling," and not "Real Estate," and consisted of only $9,306:

| SCHEDULE C<br>(Form 1040 or 1040-SR)<br><br>Department of the Treasury<br>Internal Revenue Service (99) | **Profit or Loss From Business**<br>(Sole Proprietorship)<br><br>▶ Go to *www.irs.gov/ScheduleC* for instructions and the latest informat<br>▶ Attach to Form 1040, 1040-SR, 1040-NR, or 1041; partnerships generally must fi |
|---|---|
| Name of proprietor<br>Daniel Cleggett | |
| A    Principal business or profession, including product or service (see instructions)<br>      Counseling | |
| C    Business name. If no separate business name, leave blank.<br>      A Vision from God LLC | |

f. As of April 1, 2020 (the date of the "Daniel Cleggett Sole Proprietorship" EIDL application), CLEGGETT knew that he was engaged in illegal activity, which included the Sober Home Wire Fraud Conspiracy and the Sober Home Mortgage Fraud Conspiracy (as described above), as well as the false AVFG EIDL application.

72.   CLEGGETT knew that the GREEN SAVE EIDL application was false because, among other things:

a. The applicant for the GREEN SAVE EIDL application was CLEGGETT, himself, and not CLEGGETT's mother.

b. As of April 1, 2020 GREEN SAVE did not have 17 employees,[10] but rather, fewer than 10 employees because CLEGGETT had laid off several GREEN SAVE employees after the COVID-19 pandemic began.

c. As of April 1, 2020 (the date of the application), CLEGGETT knew that he was engaged in illegal activity, which included the Sober Home Wire Fraud Conspiracy and the Sober Home Mortgage Fraud Conspiracy (as described above), the false

---

[10] By listing more than 10 employees for GREEN SAVE, CLEGGETT received the maximum $10,000 EIDL advance payment.

AVFG EIDL application, and the false "Daniel Cleggett Sole Proprietorship" EIDL application.

*CLEGGETT Submits EIDL Loan Modification Application for GREEN SAVE in 2022*

73.     As part of the COVID-19 EIDL program, applicants that qualified and had received initial COVID EIDLs were eligible to apply for an EIDL modification that permitted additional borrowing of up to $500,000, in total.   GREEN SAVE had received a $150,000 COVID EIDL in June 2020.   GREEN GIANTS and INSULATION SITUATION were ineligible for COVID EIDLs because they did not exist and had no business prior to 2020.

74.     On or about April 12, 2022, CLEGGETT applied for an EIDL modification for GREEN SAVE, requesting an additional $350,000.   By April 2022, however, GREEN SAVE had been terminated from the Mass Save program, GREEN SAVE was no longer receiving Mass Save payments, GREEN SAVE had closed the checking account (account ending x4424) that had received the initial $150,000 COVID-19 EIDL, and GREEN SAVE had no employees, with the exception of CLEGGETT.

75.     On or about April 28, 2022, the SBA approved GREEN SAVE's EIDL modification based on (i) the false information that CLEGGETT provided in GREEN SAVE's initial EIDL application (2020); and (ii) the false pretenses and false certifications under which CLEGGETT was seeking the EIDL modification.

76.     Because CLEGGETT had closed the GREEN SAVE bank account (account ending x4424) which had received the initial $150,000 COVID-19 EIDL, CLEGGETT – pretending to be his mother (the listed owner of GREEN SAVE) – sent the below April 29, 2022 email to the SBA, directing the SBA to issue the $350,000 EIDL loan modification to the GREEN SAVE checking account (account ending x5138):

> **Good morning,**
>
>    I have a new business checking account now. Can you please update our bank account on file to this business checking account attached with my license. Thank you
>
> **Green Save Energy**
> ███████ **Cleggett. Owner**

77.    CLEGGETT knew that the April 29, 2022 email to the SBA was false and misleading in material respects, including the following: (i) CLEGGETT's mother did not write the email; (ii) the GREEN SAVE checking account (ending x5138) was not new, but had been opened in September 2018; (iii) CLEGGETT's mother exercised no control or authority over the GREEN SAVE checking account (ending x5138) and had never been issued a debit card for the account; and (iv) as of May 16, 2019, CLEGGETT had removed his mother as an authorized signatory to both GREEN SAVE checking accounts (ending x4424; and ending x5138), leaving CLEGGETT as the only authorized signatory for both GREEN SAVE checking accounts.

*CLEGGETT Uses EIDL Loan Proceeds for Personal Expenses*

78.    EIDL proceeds were permitted to be used for payroll expenses, sick leave, production costs, and business obligations, such as debts, rent, and mortgage payments.

79.    For each EIDL and modification, CLEGGETT was required to certify, among other things, that: (i) the "Borrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter ....."; and that (ii) "none of the Obligations [loan proceeds] are or will be primarily for personal, family or household purposes[.]"

80.     On or about the below dates, CLEGGETT received the following COVID EIDLs and advances:

| CLEGGETT Entity (account) | EIDL Loan (date) | | EIDL Advance (date) | |
|---|---|---|---|---|
| AVFG (x9037) | $150,000 | 6/30/2020 | $2,000 | 4/24/2020 |
| "Daniel Cleggett Sole Proprietorship" (x9448) | $130,900 | 6/26/2020 | $1,000 | 4/24/2020 |
| GREEN SAVE (x4424) | $150,000 | 6/26/2020 | $10,000 | 4/24/2020 |
| GREEN SAVE (x5138) | $350,000 | 5/4/2022 | n/a | n/a |
| Total: $794,900 | $780,900.00 | | $13,000.00 | |

81.     Despite certifying that EIDL proceeds would only be used for "working capital" for the entity seeking the loan, and not "primarily for personal, family or household purposes," CLEGGETT used tens of thousands of dollars from the above COVID EIDL funds to pay for personal, family, and household expenses.

82.     These personal expenses included, EZ-Pass bills, gym membership fees, pet expenses and veterinary bills, airline tickets, car rentals, vacation trips to Yellowstone, Montana and Aruba, and thousands of dollars in hotel resort stays for CLEGGETT and his GIRLFRIEND (e.g., Chatham Bars Inn, MA, Cliff House Resort, ME, Ocean House, RI, Westin St. John Resort), which included spa fees, wine and caviar dinner, and other expenses.

83.     CLEGGETT also used COVID EIDL proceeds in other ways that were contrary to the terms of the loan agreements.    For example, CLEGGETT used "Daniel Cleggett Sole Proprietorship" EIDL proceeds to help fund the purchase of Westville-P2 (a sober home).

84.     In another example, CLEGGETT used the GREEN SAVE $350,000 EIDL funds to pay for tens of thousands of dollars in GREEN GIANTS and INSULATION SITUATION expenses;

thousands of dollars in AVFG sober home expenses; as well as tens of thousands of dollars in personal expenses (including $37,997 in wedding expenses paid to the Chatham Bars Inn).

85.     This was contrary to the GREEN SAVE EIDL terms because, among other things, (i) GREEN SAVE was essentially defunct and terminated from the Mass Save program by April 2022; (ii) GREEN GIANTS and INSULATION SITUATION were ineligible for COVID EIDLs because both entities had been formed in 2021 (and not before February 1, 2020); and (iii) loan funds could not be used for AVFG or for personal expenses.

## COUNT ONE
Conspiracy to Commit Wire Fraud (Sober Home Wire Fraud Conspiracy)
(18 U.S.C. § 1349)

The Grand Jury charges:

86.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-19 of this

Indictment.

87.     From at least early as January 2019 through at least in or about July 2020 in the District of

Massachusetts and elsewhere, the defendants,

(1) DANIEL JAMES CLEGGETT, JR, and
(2) NICHOLAS ESPINOSA,

conspired with each other and with others known and unknown to the Grand Jury to commit wire

fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain

money and property by means of materially false and fraudulent pretenses, representations and

promises, did transmit and cause to be transmitted, by means of wire communications in interstate

and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing

the Sober Home scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

COUNT TWO
Conspiracy to Make False Statements to a Mortgage Lending Business
(Mortgage Fraud Conspiracy)
(18 U.S.C. § 371)

The Grand Jury further charges:

88.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-30 of this
Indictment.

89.     From at least in or about March 2021 through in or about December 2021, in the District
of Massachusetts and elsewhere, the defendants,

(1) DANIEL JAMES CLEGGETT, JR., and
(2) NICHOLAS ESPINOSA

conspired with each other and with others known and unknown to the Grand Jury to commit an
offense against the United States, to wit, Making a False Statement to a Mortgage Lending
Business, that is, to knowingly make a false statement and report for the purpose of influencing in
any way the action of Guaranteed Rate, a mortgage lending business, in order to obtain a home
mortgage loan for Putnam P-3.

All in violation of Title 18, United States Code, Section 371.

## COUNT THREE
Conspiracy to Commit Wire Fraud (Insulation Company Wire Fraud Conspiracy)
(18 U.S.C. § 1349)

The Grand Jury further charges:

90.   The Grand Jury re-alleges and incorporates by reference paragraphs 1-60 of this Indictment.

91.   From at least in or about June 2021 through in or about January 2023 in the District of Massachusetts and elsewhere, the defendants,

(1) DANIEL JAMES CLEGGETT, JR., and
(2) NICHOLAS ESPINOSA

conspired with each other and with others known and unknown to the Grand Jury to commit wire fraud, that is, having devised and intending to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, did transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing the Insulation Company scheme to defraud, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1349.

COUNTS FOUR - FOURTEEN
Wire Fraud; Aiding and Abetting (Sober Home Wire Fraud)
(18 U.S.C. §§ 1343 and 2)

The Grand Jury further charges:

92.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-19 of this

Indictment.

93.     On or about the dates listed below, in the District of Massachusetts, and elsewhere, the

defendants,

(1) DANIEL JAMES CLEGGETT, JR. and
(2) NICHOLAS ESPINOSA

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money

and property by means of materially false and fraudulent pretenses, representations and promises,

did transmit and cause to be transmitted by means of wire communications in interstate and foreign

commerce, writings, signs, signals, pictures and sounds for the purpose of executing the Sober

Home scheme to defraud, as set forth below:

| Count | Check Date | Check Posting Date | Description |
|---|---|---|---|
| 4 | 1/21/2019 | 1/25/2019 | $15,500 Family Trust check deposit posted to AVFG account |
| 5 | 2/13/2019 | 2/19/2019 | $15,500 Family Trust check deposit posted to AVFG account |
| 6 | 3/11/2019 | 3/14/2019 | $15,500 Family Trust check deposit posted to AVFG account |
| 7 | 4/15/2019 | 4/19/2019 | $15,500 Family Trust check deposit posted to AVFG account |
| 8 | 5/13/2019 | 5/17/2019 | $15,500 Family Trust check deposit posted to AVFG account |
| 9 | 9/27/2019 | 10/1/2019 | $15,500 Family Trust check deposit posted to AVFG account |
| 10 | 11/4/2019 | 11/8/2019 | $15,500 Family Trust check deposit posted to AVFG account |
| 11 | 12/4/2019 | 12/17/2019 | $15,500 Family Trust check deposit posted to AVFG account |
| 12 | 1/10/2020 | 1/23/2020 | $15,500 Family Trust check deposit posted to AVFG account |
| 13 | 2/3/2020 | 3/13/2020 | $15,500 Family Trust check deposit posted to AVFG account |
| 14 | 5/28/2020 | 6/29/2020 | $15,500 Family Trust check deposit posted to AVFG account |

All in violation of Title 18, United States Code, Sections 1343 and 2.

COUNTS FIFTEEN – TWENTY-FOUR
Wire Fraud; Aiding and Abetting (Insulation Company Wire Fraud)
(18 U.S.C. §§ 1343 and 2)

The Grand Jury further charges:

94.    The Grand Jury re-alleges and incorporates by reference paragraphs 1-60 of this

Indictment.

95.    On or about the dates listed below, in the District of Massachusetts, and elsewhere, the

defendants,

(1) DANIEL JAMES CLEGGETT, JR. and
(2) NICHOLAS ESPINOSA

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money

and property by means of materially false and fraudulent pretenses, representations and promises,

did transmit and cause to be transmitted by means of wire communications in interstate and foreign

commerce, writings, signs, signals, pictures and sounds for the purpose of executing the Insulation

Company scheme to defraud, as set forth below:

| Count | Approximate Date | Description | Payment Amount |
|-------|------------------|-------------|----------------|
| 15 | 12/8/2021 | Company A payment to GREEN GIANTS | $8,746.46 |
| 16 | 4/21/2022 | Company A payment to INSULATION SITUATION | $10,558.79 |
| 17 | 5/5/2022 | Company A payment to INSULATION SITUATION | $11,640.29 |
| 18 | 6/2/2022 | Company A payment to GREEN GIANTS | $27,851.08 |
| 19 | 7/21/2022 | Company A payment to INSULATION SITUATION | $12,439.91 |
| 20 | 8/4/2022 | Company A payment to GREEN GIANTS | $16,651.72 |
| 21 | 8/18/2022 | Company A payment to INSULATION SITUATION | $28,196.17 |
| 22 | 10/27/2022 | Company A payment to GREEN GIANTS | $25,327.97 |
| 23 | 12/9/2022 | Company A payment to GREEN GIANTS | $18,795.75 |
| 24 | 12/15/2022 | Company A payment to INSULATION SITUATION | $19,263.87 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS TWENTY-FIVE – TWENTY-EIGHT
Wire Fraud; Aiding and Abetting (EIDL Wire Fraud)
(18 U.S.C. §§ 1343 and 2)

The Grand Jury further charges:

96.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-85 of this

Indictment.

97.     On or about the dates listed below, in the District of Massachusetts, and elsewhere, the

defendant,

### (1) DANIEL JAMES CLEGGETT, JR.

having devised and intending to devise a scheme and artifice to defraud, and for obtaining money

and property by means of materially false and fraudulent pretenses, representations and promises,

did transmit and cause to be transmitted by means of wire communications in interstate and foreign

commerce, writings, signs, signals, pictures and sounds for the purpose of executing the EIDL

scheme to defraud, as set forth below:

| Count | Approximate Date | Description (approximate dollar amounts) |
|-------|------------------|------------------------------------------|
| 25 | 6/26/2020 | $130,900 SBA funds transfer to Daniel Cleggett Sole Proprietorship account (x9448) |
| 26 | 6/26/2020 | $150,000 SBA funds transfer to GREEN SAVE account (x4424) |
| 27 | 6/30/2020 | $150,000 SBA funds transfer to AVFG bank account (x9037) |
| 28 | 5/4/2022 | $350,000 SBA funds transfer to GREEN SAVE account (x5138) |

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNTS TWENTY-NINE – THIRTY-FOUR
Unlawful Monetary Transactions, Aiding and Abetting (Sober Home Wire Fraud)
(18 U.S.C. §§ 1957 and 2)

The Grand Jury further charges:

98.     The Grand Jury re-alleges and incorporates by reference paragraphs 1-19 of this

Indictment.

99.     On or about the dates listed below, in the District of Massachusetts, and elsewhere, the

defendants,

(1) DANIEL JAMES CLEGGETT, JR. and
(2) NICHOLAS ESPINOSA

knowingly engaged and attempted to engage in a monetary transaction in criminally derived

property of a value greater than $10,000, as set forth below, and on the below approximate dates,

where such property was derived from specified unlawful activity, that is, wire fraud, in violation

of Title 18, United States Code, Section 1343:

| Count | Check Date | Check Deposit Date | Description |
|---|---|---|---|
| 29 | 2/5/2019 | 2/5/2019 | $11,750 "refund" check from AVFG account to CC#1 |
| 30 | 2/26/2019 | 2/26/2019 | $12,500 "refund" check from AVFG account to CC#1 |
| 31 | 3/20/2019 | 3/20/2019 | $12,500 "refund" check from AVFG account to CC#1 |
| 32 | 4/26/2019 | 4/29/2019 | $12,500 "refund" check from AVFG account to CC#1 |
| 33 | 12/23/2019 | 12/23/2019 | $12,500 "refund" check from AVFG account to CC#1 |
| 34 | 2/11/2020 | 2/13/2020 | $12,500 "overpayment" check from AVFG account to CC#1 |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT THIRTY-FIVE
Making False Statements to a Mortgage Lending Business; Aiding and Abetting
(18 U.S.C. §§ 1014 and 2)

The Grand Jury further charges:

100.   The Grand Jury re-alleges and incorporates by reference paragraphs 1-30 of this Indictment.

101.   On or about the dates listed below, in the District of Massachusetts, and elsewhere, the defendant,

### (1) DANIEL JAMES CLEGGETT, JR.

knowingly made a false statement and report for the purpose of influencing in any way the action of Guaranteed Rate, a mortgage lending business, in order to obtain an approximately $546,250 mortgage loan from Guaranteed Rate to purchase Lambert-P1:

| Count | Document/ Dates | Material false statement/omission |
|-------|-----------------|-----------------------------------|
| 35 | Lease agreement between CLEGGETT and his GIRLFRIEND (9/9/2019) in connection with Home Mortgage Loan for Lambert-P1 ($546,250) | • Statement that CLEGGETT's GIRLFRIEND would be paying rent to CLEGGETT to stay at the CLEGGETT RESIDENCE.<br>• Omission that CLEGGETT would be funding his GIRLFRIEND's rent payments. |
| | Loan application (10/10/2019) in connection with Home Mortgage Loan for Lambert-P1 ($546,250) | • Statement that CLEGGETT was receiving rental income of $3,200 per month for the CLEGGETT RESIDENCE.<br>• Omission that CLEGGETT would be funding his GIRLFRIEND's rent payments.<br>• Statement that CLEGGETT intended to purchase and occupy Lambert-P1 as his primary residence.<br>• Omission that CLEGGETT intended to purchase Lambert-P1 to use as a sober home residence for his business. |

All in violation of Title 18, United States Code, Sections 1014 and 2.

## COUNT THIRTY-SIX
Making False Statements to a Mortgage Lending Business; Aiding and Abetting
(18 U.S.C. §§ 1014 and 2)

The Grand Jury further charges:

102.   The Grand Jury re-alleges and incorporates by reference paragraphs 1-30 of this Indictment.

103.   On or about the date listed below, in the District of Massachusetts, and elsewhere, the defendant,

### (1) DANIEL JAMES CLEGGETT, JR.

knowingly made a false statement and report for the purpose of influencing in any way the action of Monarch Mortgage, a mortgage lending business, in order to obtain an approximately $531,389 mortgage loan from Monarch Mortgage to purchase Westville-P2:

| Count | Document/ Dates | Material false statement/omission |
|-------|-----------------|-----------------------------------|
| 36 | Loan application (7/26/2021) in connection with Home Mortgage Loan for Westville-P2 ($531,389) | • Statement that CC#2 intended to purchase and occupy Westville-P2 as CC#2's primary residence. <br>• Omission that CLEGGETT was the de facto borrower and the intended purchaser and owner of Westville-P2. <br>• Omission that CLEGGETT intended to purchase Westville-P2 to use as a sober home residence for his business. |

All in violation of Title 18, United States Code, Sections 1014 and 2.

COUNT THIRTY-SEVEN
Making False Statements to a Mortgage Lending Business; Aiding and Abetting
(18 U.S.C. §§ 1014 and 2)

The Grand Jury further charges:

104.    The  Grand  Jury  re-alleges  and  incorporates  by  reference  paragraphs 1-30  of  this

Indictment.

105.    On or about the dates listed below, in the District of Massachusetts, and elsewhere, the

defendants,

(1) DANIEL JAMES CLEGGETT, JR. and
(2) NICHOLAS ESPINOSA

knowingly made a false statement and report for the purpose of influencing in any way the action

of the Guaranteed Rate, a mortgage lending business, in order to obtain an approximately $463,980

mortgage loan from Guaranteed Rate to purchase Putnam-P3:

| Count | Document/ Dates | Material false statement/omission |
|-------|-----------------|-----------------------------------|
| 37 | Gift letter (10/6/2021) in connection with Home Mortgage Loan for Putnam-P3 ($463,980) | • Statement from ESPINOSA's girlfriend that no repayment of the $4,356.33 gift to ESPINOSA was expected or implied.<br>• Omission that ESPINOSA had told ESPINOSA's girlfriend that she would be repaid the $4,356.33 gift. |
| | Loan application (12/20/2021) in connection with Home Mortgage Loan for Putnam-P3 ($463,980) | • Statement that ESPINOSA intended to purchase and occupy Putnam-P3 as ESPINOSA's primary residence.<br>• Omission that CLEGGETT was the de facto borrower and the intended purchaser and owner of Putnam-P3.<br>• Omission that CLEGGETT intended to purchase Putnam-P3 to use as a sober home residence for his business. |

All in violation of Title 18, United States Code, Sections 1014 and 2.

WIRE FRAUD FORFEITURE ALLEGATION
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

106.     Upon conviction of the offenses in violation of Title 18, United States Code, Sections 1343

and 1349 set forth in Counts One, Three, and Four through Twenty-Eight, the defendants,

(1) DANIEL JAMES CLEGGETT, JR. and
(2) NICHOLAS ESPINOSA

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C),

and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes

or is derived from proceeds traceable to the offenses.

107.     If any of the property described in the paragraph directly above, as being forfeitable

pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code,

Section 2461(c), as a result of any act or omission of the defendants --

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third party;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be divided without
       difficulty;

it is the intention of the United States, pursuant to Title 28, United States Code, Section 2461(c),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of the defendants up to the value of the property described in the paragraph directly above.

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United

States Code, Section 2461(c).

## MORTGAGE FRAUD FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(2)(A))

108.    Upon conviction of one or more of the offenses in violation of Title 18, United States Code, Sections 371 and 1014 set forth in Counts Two, and Thirty-Five through Thirty-Seven, the defendants,

(1) DANIEL JAMES CLEGGETT, JR. and
(2) NICHOLAS ESPINOSA

shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(2), any property constituting, or derived from, proceeds obtained directly or indirectly as a result of such offenses.

109.    If any of the property described in the paragraph directly above, as being forfeitable pursuant to Title 18, United States Code, Section 982(a)(2), as a result of any act or omission of the defendants --

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third party;

      c.   has been placed beyond the jurisdiction of the Court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the property described in the paragraph directly above.

All pursuant to Title 18, United States Code, Section 982(a)(2).

## MONEY LAUNDERING FORFEITURE ALLEGATION
### (18 U.S.C. § 982(a)(1))

110.    Upon conviction of one or more of the offenses in violation of Title 18, United States Code,

Section 1957 set forth in Counts Twenty-Nine through Thirty-Four, the defendants,

(1) DANIEL JAMES CLEGGETT, JR. and
(2) NICHOLAS ESPINOSA

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any

property, real or personal, involved in such offenses, and any property traceable to such property.

111.    If any of the property described in the paragraph directly above, as being forfeitable

pursuant to Title 18, United States Code, Section 982(a)(1), as a result of any act or omission of

the defendants --

      a.  cannot be located upon the exercise of due diligence;

      b.  has been transferred or sold to, or deposited with, a third party;

      c.  has been placed beyond the jurisdiction of the Court;

      d.  has been substantially diminished in value; or

      e.  has been commingled with other property which cannot be divided without
         difficulty;

it is the intention of the United States, pursuant to Title 18, United States Code, Section 982(b),

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other

property of the defendants up to the value of the property described in the paragraph directly

above.

All pursuant to Title 18, United States Code, Section 982(a)(1).

A TRUE BILL

FOREPERSON

JOHN MULCAHY
DUSTIN CHAO
ASSISTANT UNITED STATES ATTORNEYS
DISTRICT OF MASSACHUSETTS


District of Massachusetts: May 18, 2023
Returned into the District Court by the Grand Jurors and filed.

/s/ Leonardo T. Vieira, signed at 12:22pm
DEPUTY CLERK

43